***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The employee-employer relationship existed between plaintiff and defendant-employer in that plaintiff was employed by defendant-employer on May 25, 2001.
2. On May 25, 2001, while plaintiff was employed by defendant-employer, the parties were subject to and bound by the provisions of the Workers' Compensation Act, and defendant-employer was insured by Federal Insurance Company.
3. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
4. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
5. Plaintiff received severance pay on or about July 27, 2001 in the amount of $1,872.00. Plaintiff received a stay-on bonus on or about July 27, 2001 in the amount of $1,000.00. Plaintiff was paid for unused vacation time on or about July 27, 2001 in the amount of $846.14. Plaintiff's average weekly wage was $703.38.
6. The parties contend the contested issues to be tried by the court are as follows: Whether plaintiff's carpal tunnel syndrome is compensable? Whether plaintiff is entitled to ongoing medical treatment for his arm injury? What type of benefits, including medical compensation, is plaintiff entitled to recover?
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old, living in Raleigh, North Carolina, and attending Wake Technical Community College to obtain additional training in computer programming. Plaintiff received an architectural technology degree in New York in 1990. While plaintiff worked in his field of study drafting home plans on a computer with Chelsea Homes for a short time between 1993 and 1994, plaintiff primarily worked in assembly of computers while living in New York. Plaintiff worked from 1990 until 1992 and then again from 1994 until 1996 for IBM as a Process Technician which required assembly of computer boards and movement of equipment on an assembly line. Plaintiff performed x-ray analysis of circuit boards but also frequently lifted heavy computer parts.
2. Plaintiff moved to North Carolina in 1997 and attended a one-year program at Wake Technical Community College and received a certificate in computer information systems. In addition, from February 1997 through the year 2000, plaintiff was employed at Global Knowledge Networks where he was a computer technician. Plaintiff's job duties included moving and lifting hardware and computer manuals as well as packing and unpacking equipment. Plaintiff was required to lift, push and pull boxes in excess of 50 pounds. Plaintiff also performed lighter duties including installing software and ordering parts. Plaintiff left this employment for better employment with defendant-employer where he began working in April 2000 as a quality assurance technician testing the final product both visually and manually. Plaintiff received boxes containing computer components and unpacked them and placed them on a bench in order to perform various visual and manual tests. Plaintiff's employment also required document updating, processing and reading. Three to four other employees also performed the quality assurance technician job.
3. On May 25, 2001, plaintiff was injured at work during a touch football game when he fell on the floor with his right elbow outstretched. Plaintiff was taken immediately to Rex Urgent Care and Concentra where he was seen by Dr. Derek L. Reinke, Jr. of Cary Orthopaedic Sports Medicine Center and underwent x-rays of his right elbow. Plaintiff was diagnosed with a dislocation at the elbow with a fracture of the base of the coronoid process of the ulna. Dr. Reinke reduced the right elbow dislocation. Plaintiff was released with lifting restrictions and instructed to wear a sling and to follow-up in four days. Plaintiff did not report a shoulder injury and he was not diagnosed with a shoulder dislocation, although a diagnosis code for shoulder dislocation was apparently entered inadvertently into the Concentra medical notes. Plaintiff's testimony to the contrary is given little weight.
4. Plaintiff returned to work light duty and then for follow-up treatment on May 29, 2001 and May 30, 2001. Plaintiff was again released to return to work on May 29, 2001 with the requirement that he wear a sling and not lift over 1 pound repetitively with his right arm as well as other restrictions on pushing and pulling with his right arm. Plaintiff did not miss any work and worked light duty in his regular position with modifications. In addition, plaintiff could not drive while wearing the sling and was provided transportation through a coworker or manager with defendant-employer.
5. On June 6, 2001, plaintiff was seen by Dr. Andersen at Cary Orthopaedic Sports Medicine Center at which time, plaintiff had some swelling around his elbow and minimal tenderness without pain. Dr. Andersen recommended physical therapy for range of motion improvement. Dr. Andersen restricted plaintiff for three weeks from lifting or carrying greater than 5 pounds and no pulling or pushing with his right arm. Simple grasping was approved but plaintiff was restricted from driving. Dr. Andersen indicated that plaintiff would see Dr. Reinke the following week and that plaintiff could potentially begin driving then if his range of motion improved. Plaintiff was again provided transportation to work and continued to perform light duty with defendant-employer and receive his regular wages.
6. On June 12, 2001, plaintiff was seen by Dr. Reinke who recommended physical therapy for range of motion and continued work with a 5 pound lifting restriction for 2 weeks; however, Dr. Reinke did not restrict plaintiff from driving. Thereafter, plaintiff continued to work light duty for defendant-employer and returned to Dr. Reinke on July 10, 2001. Plaintiff's condition including his range of motion was improved. Dr. Reinke indicated that plaintiff had some residual aches and pains and a potential for arthritis. Dr. Reinke did not address work restrictions at this visit and his earlier restrictions were in force for two weeks. Dr. Reinke advised plaintiff to return for a "final check" in six weeks.
7. Plaintiff continued to work light duty with defendant-employer, although there is evidence of record based upon Dr. Reinke's notes that plaintiff had been capable of full duty since approximately the end of June 2001. In addition, plaintiff was no longer restricted from driving. Plaintiff performed essential functions of his regular job including visual inspections and reading, processing and updating documents for approximately 40% of his workday. In addition, plaintiff performed computer work for approximately 60% of his workday. Plaintiff received minimal modifications to his job in that he was assisted by coworkers with lifting requirements.
8. Plaintiff performed the essential functions of his regular job without difficulty and continued his employment with defendant-employer until he was laid off when the facility closed on July 27, 2001 due to the fact that defendant-employer's contract for work had terminated. All of the other employees hired in Research Triangle Park were also terminated; however, upper level managers who had come from out of town to work on the contract were transferred and remained with defendant-employer. Plaintiff had been informed of this impending termination in May 2001 prior to his injury by accident. In fact, plaintiff entered an agreement with defendant-employer prior to his injury to continue his employment with defendant-employer until the end of the contract and the close of the facility. In exchange for continuing his employment with defendant-employer, plaintiff received a $1,000.00 bonus and severance pay in the amount of $1,872.00. Plaintiff was also paid for unused accrued vacation pay in the amount of $846.14. In addition, plaintiff received $334.00 per week in unemployment benefits from August 27, 2001 to November 24, 2001. Plaintiff was required to seek employment, at least two jobs a week, as a condition to receiving benefits.
9. On August 22, 2001, Dr. Reinke examined plaintiff whose condition was improved. Plaintiff did not complain of elbow symptoms other than some residual discomfort when exercising performing "push-ups" with some weakness. Plaintiff had no symptoms of ulnar nerve irritation and did not complain of shoulder, hand, or wrist symptoms. Dr. Reinke specifically released plaintiff to perform all normal activities including regular duty work. Plaintiff's contention at the hearing that he had permanent work restrictions of no lifting greater than five pounds is given little weight. In addition, his complaints at the hearing of continuing disabling pain at the time of his release are inconsistent with the contemporaneous medical records and the opinion of Dr. Reinke.
10. On August 27, 2001, Dr. Reinke assigned plaintiff a 10% permanent partial impairment rating for his elbow, and noted that he did not feel plaintiff would require any permanent restrictions as a result of the injury.
11. Plaintiff continued to seek employment and eventually located employment at ARC working as a help-desk analyst in November 2001. Plaintiff's duties included customer assistance via telephone to resolve hardware and software problems. Plaintiff was paid $17.50 per hour and worked alternating weeks of 34 or 48 hours per week. Plaintiff continued in this employment until approximately February 2001 when plaintiff was terminated for failure to meet performance expectations. Plaintiff's termination was unrelated to his elbow condition. Thereafter, plaintiff continued to seek employment and again received unemployment benefits from March 9, 2002 to May 3, 2003 at a rate of $339.00 per week. Plaintiff testified that he did not seek certain positions because of their physical requirements. However, the greater weight of the evidence of record demonstrates that plaintiff was not under any work restrictions and plaintiff's contention to the contrary is given little weight. Plaintiff also eventually returned to Wake Technical Community College for additional training in the fall of 2003.
12. Plaintiff did not seek any medical treatment for his elbow condition or any alleged shoulder condition for approximately a year when plaintiff returned to Dr. Reinke on July 8, 2002. Plaintiff reported having pain in his right upper extremity beginning in his shoulder and radiating down into his forearm. Plaintiff's pain was more in the shoulder and forearm than in the elbow and he had no elbow instability. Dr. Reinke obtained x-rays and found no evidence of subluxation or arthritis. Dr. Reinke found no relationship between plaintiff's elbow injury and his shoulder condition, of which plaintiff did not complain until over a year after the injury. Plaintiff was again released to full duty work.
13. Plaintiff returned to Dr. Reinke on August 5, 2002 and complained of numbness from his forearm and elbow radiating into his right hand. Plaintiff complained of numbness when he drove and difficulty sleeping. Plaintiff had not complained of these symptoms previously. Dr. Reinke felt that plaintiff's symptoms were difficult to explain and diffuse; however, he felt the symptoms could be from nerve compression at the neck or elbow. Dr. Reinke released plaintiff to full-duty work and ordered an EMG study, which was performed by Dr. Pamela Whitney on September 3, 2002. Dr. Whitney found the study results possibly consistent with posterior interosseous nerve involvement; however, clinical correlation was advised. Plaintiff returned to Dr. Reinke and received an injection on September 17, 2002. Dr. Reinke felt that any condition involving plaintiff's interosseous nerve would not be related to his elbow dislocation but was usually related to overuse. In fact, plaintiff has a work history of performing assembly-type work.
14. On October 15, 2002, plaintiff returned to Dr. Reinke complaining of pain over the forearm and pain with wrist extension and middle finger extension and supination. Plaintiff reported minimal improvement from the earlier injection. Dr. Reinke provided plaintiff pain medication; however, he was unsure of the etiology of plaintiff's pain. Therefore, Dr. Reinke referred plaintiff to Dr. George Edwards to obtain another opinion as to whether plaintiff suffered from an interosseous nerve problem.
15. On December 19, 2002, plaintiff was seen for a one-time evaluation by Dr. Edwards. Plaintiff reported being out of work due to his elbow injury. Dr. Edwards diagnosed carpal tunnel syndrome and extensor tendonitis at the elbow but found no interosseous nerve palsy. Dr. Edwards recommended a carpal tunnel injection and found that plaintiff was not a surgical candidate. Dr. Edwards did not address work restrictions during his evaluation.
16. On January 10, 2003, plaintiff returned to Dr. Reinke who found a positive Tinel's and Phalen's sign. Plaintiff reported hand numbness but did not feel that it was a major problem. Dr. Reinke recommended that plaintiff see Dr. Edwards for a carpal tunnel injection; however, Dr. Reinke found that plaintiff's carpal tunnel syndrome is unrelated to his elbow injury and dislocation. Dr. Reinke continued to believe that plaintiff was capable of full-duty work. Plaintiff has not received any medical treatment since January 10, 2003.
17. Plaintiff filed a Form 18 dated May 9, 2003 complaining of an injury to his right elbow; however, plaintiff did not complain of a shoulder injury or carpal tunnel syndrome.
18. Dr. Reinke was unable to relate plaintiff's shoulder complaints or carpal tunnel complaints to his injury by accident and unable to correlate any of plaintiff's symptoms beginning in July 2002 with his original injury of May 25, 2001. Furthermore, Dr. Reinke felt that plaintiff could work full-duty since at least August 22, 2001. Like Dr. Reinke, Dr. Edwards did not find plaintiff's carpal tunnel syndrome related to his elbow injury. However, to the extent that Dr. Edwards related plaintiff's carpal tunnel condition or other conditions or symptoms in December 2002 to the May 25, 2001 work related injury, his opinion is afforded little weight as it is based on a one-time evaluation of plaintiff, which occurred over a year and a half after the injury. Furthermore, Dr. Edwards's opinion to the extent that it relates plaintiff's current condition to his original injury is based on inaccurate facts and assumptions, which are the basis for temporal conclusions. Furthermore, Dr. Reinke's opinion is given greater weight with regard to plaintiff's work abilities than that of Dr. Edwards as Dr. Reinke is in a better position to determine plaintiff's ability to work considering his lengthy treatment of plaintiff, which began immediately after the injury and continued during the duration of plaintiff's complaints. However, even if plaintiff in fact requires work restrictions as indicated by Dr. Edwards, the greater weight of the evidence fails to demonstrate that these restrictions resulted from plaintiff's May 25, 2001 injury by accident. Moreover, Dr. Edwards addressed plaintiff's restrictions in retrospect after a one-time evaluation and Dr. Edwards had difficulty assessing plaintiff's abilities, as plaintiff did not give full effort on the administered tests.
19. While plaintiff contends that he dislocated his shoulder at the time of his injury, the greater weight of the evidence of record including the medical records fails to prove that plaintiff suffered any shoulder injury at the time of his fall or that he received any treatment for a shoulder injury or dislocation during the year following his fall.
20. While plaintiff may be in need of additional medical treatment for his carpal tunnel syndrome, plaintiff has failed to prove by the greater weight of the evidence that his carpal tunnel syndrome or any of his current symptoms are related to his original injury by accident.
21. Following his injury, plaintiff continued to work without missing any time from work for defendant-employer performing the essential functions of his employment and plaintiff was paid his full wages. Any minor modifications made to plaintiff's duties did not render the job performed by plaintiff make-work. Furthermore, plaintiff was capable of performing full duty work as early as the end of June 2001 or at the latest August 22, 2001. Plaintiff's employment was terminated due to reasons unrelated to his injury by accident when he was laid off due to the end of the contract period. Plaintiff has failed to prove by the greater weight of the evidence that his inability to earn wages beginning July 27, 2001 was due to his injury by accident. Furthermore, while plaintiff contends that his search for employment was limited by restrictions, the greater weight of the evidence demonstrates that plaintiff has been capable of full duty employment since at least August 22, 2001 when he reached maximum medical improvement. Furthermore, plaintiff's termination from his employment with ARC was unrelated to his injury by accident. Plaintiff's inability, if any, to earn wages subsequent to his last date of employment with defendant-employer is unrelated to his injury by accident.
22. Plaintiff's average weekly wage is $703.38, yielding a weekly compensation rate of $468.94.
23. Plaintiff reached maximum medical improvement on August 22, 2001 and retains a 10 % permanent partial impairment.
24. Plaintiff received vacation pay, bonus pay and severance pay to which he was entitled regardless of his injury by accident due to the fact that his vacation pay had accrued and due to his contractual agreement prior to his injury with defendant-employer in which he provided consideration by agreeing to remain employed with defendant-employer. These payments were not made for the purposes of wage replacement tantamount to workers' compensation benefits and plaintiff had a vested right to these benefits regardless of his injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident on May 25, 2001 resulting in an elbow dislocation. However, plaintiff has failed to prove by the greater weight of the evidence that his injury by accident resulted in interosseous nerve palsy, a shoulder condition or carpal tunnel syndrome. N.C. Gen. Stat. § 97-2(6);Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003).
2. Plaintiff has the burden to prove disability and its extent as well as the relationship of any alleged disability to his injury by accident. Plaintiff has failed to prove by the greater weight of the evidence that he sustained any temporary total or temporary partial disability as a result of his injury by accident with defendant employer. N.C. Gen. Stat. § 97-29; N.C. Gen. Stat. § 97-30; Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982); Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993).
3. Plaintiff's average weekly wage is $703.38 yielding a weekly compensation rate of $468.94. N.C. Gen. Stat. § 97-2(5).
4. Plaintiff reached maximum medical improvement on August 22, 2001 and is entitled to 24 weeks of permanent partial disability for his 10% impairment rating to his right arm at a weekly rate of $468.94 per week. N.C. Gen. Stat. § 97-42.
5. Defendants are not entitled to a credit for amounts received by plaintiff for vacation, severance, and bonus pay, which were not for purposes of wage replacement tantamount to workers' compensation payments. N.C. Gen. Stat. § 97-42; Estes v. NorthCarolina State Univ., 102 N.C. App. 52, 401 S.E.2d 384 (1991).
6. Defendants are not entitled to a credit for plaintiff's unemployment benefits against permanent partial disability benefits. N.C. Gen. Stat. § 97-42.1.
7. Plaintiff is entitled to expenses for reasonably necessary medical treatment, if any, for his elbow condition related to his original injury by accident of May 25, 2001 for so long as such treatment tends to provide plaintiff relief or effect a cure of any residual elbow discomfort, subject to statutory limitations. However, based upon the greater weight of the evidence the conditions of which plaintiff currently complains which require medical treatment are unrelated to his compensable injury by accident. Nevertheless, plaintiff is entitled to have defendants pay for the expenses incurred to date with Drs. Reinke, Whitney and Edwards as their evaluations and treatment were approved and reasonably necessary to obtain a diagnosis and determine what, if any, treatment was necessary and related to plaintiff's injury by accident and elbow dislocation. Plaintiff is not entitled to any recommended treatment for his carpal tunnel syndrome, which is unrelated to his injury by accident. N.C. Gen. Stat. §§ 97-25;97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff permanent partial disability benefits at a rate of $468.94 per week for 24 weeks for the 10% permanent partial impairment to his right arm, subject to a reasonable attorney's fee approved herein. As this amount has accrued, it shall be paid in one lump sum.
2. While plaintiff currently requires additional medical treatment, such treatment is unrelated to his injury by accident and elbow dislocation; therefore, plaintiff is entitled to no further medical treatment at this time. However, defendants shall pay for all expenses for reasonably necessary medical treatment and evaluations for diagnosis incurred to date with Drs. Reinke, Whitney, and Edwards.
3. An attorney's fee in the amount of twenty-five percent of the compensation due plaintiff is hereby approved for plaintiff's counsel to be deducted and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs due the Commission and any expert witness fees, if not already paid.
This the 18th day of August 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DCS/mlb